FILED
CLERK

4:37 pm, Nov 06, 2024

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
JESUS AREVALO,

                    Petitioner,

          -against-

WILLIAM LEE, Superintendent of Green
Haven Correctional Facility,

                    Respondent.
--------------------------------------------------------x

**MEMORANDUM AND ORDER**

19-CV-6962 (GRB)

**GARY R. BROWN, United States District Judge:**

Among the thousands of pages of submissions received by the Court in this matter, one

finding by a state court stands out:

> while engaged in a verbal altercation with the complainant, his ex-girlfriend, [the
> defendant] did intentionally throw the complainant into a chair multiple times
> causing a physical injury. During this assault this chair was used by the defendant
> as a dangerous instrument in order to inflict a physical injury. The defendant then
> did both kick and punch the complainant while she was on the ground. Due to
> this, the complainant suffered substantial pain throughout her body. The
> complainant received medical treatment at Winthrop University Hospital. The
> defendant stated to [a police detective,] "A bitch comes into this office and
> disrespects you I'd expect you to do the same thing!"[1]

The Office of the Nassau County District Attorney (the "DA's Office"), representing Respondent

herein, provided another account of this incident:

> On July 7, 2015, Helen Taveras, defendant's ex-girlfriend, went to an office he
> rented, in a building filled with other law offices, to confront him about money he
> owed her. After that confrontation, defendant walked out of his office and into the
> building lobby and in view of the building surveillance cameras. Taveras walked
> up behind defendant and knocked his phone out of his hand. In response, he hit
> her across the face, ripped what she was holding out of her hand, and then threw
> her to the ground. He attempted to stomp on her but she rolled away. When she
> got up, he threw her again and kicked her while she was on the ground. He broke
> off the assault while she was still on the ground and then left the scene before the

---

[1] DE 33 at 23 (quoting *Matter of Etah*, 175 A.D.3d 81, 82–83, 103 N.Y.S.3d 607, 609 (2d Dept.
2019)).

police had time to arrive. Taveras, meanwhile, went into the bathroom, then crossed the lobby and out of sight of the camera. Moments later she returned, crawling on her hands and knees across the lobby and back into the bathroom, where, crying and in pain, she called 911. When the police arrived, they saw that Taveras was bruised and swollen and had her taken to the hospital.[2]

Descriptions of this brutal episode prove startling because "the defendant" referenced here was not the Petitioner, Jesus Alvarado, but rather his now-disbarred attorney, Lawrence Etah ("Etah"). Neither Etah nor the DA's Office—which contemporaneously investigated, prosecuted and convicted Petitioner and Etah—disclosed these facts to the state courts or the defendant, despite mandatory obligations to do so. This was not an unwitting failure, as both the DA's Office and counsel well knew about the conflict. Hence, Petitioner was represented at trial and sentencing by an attorney who labored under a conflict of interest that was concealed from the court.

These events bear heavily upon the instant habeas petition brought pursuant to 18 U.S.C. § 2254. When combined with the attorney's failures in representation—most notably, failing to properly advise his client as to the existence of a conflict or request a conflict waiver hearing and his evident, unconstrained wrath at the DA's Office—these circumstances demonstrate that the conflict affected the representation, and require relief as set forth herein.

**BACKGROUND**

Notwithstanding a voluminous record extending across most of a decade, the relevant, largely undisputed facts[3] and procedural history include the following:

_____

[2] _Id._ at 70.

[3] The record is replete with other troubling issues which cast doubt on whether Petitioner received effective assistance of counsel. For example, Petitioner was arrested by a detective who broke his jaw during the arrest; that same detective would testify as a "dual expert/fact witness" at his trial. DE 36 at 8. As part of his putative "expert witness" testimony, the detective testified that petitioner was "a leader of the Uniondale gang MS-13," an expert conclusion he formulated "[f]rom talking to victims, as well as MS-13 gang members themselves." Hearing Tr. 224.

*Prosecution of the Defendant*

The DA's Office commenced a prosecution of the defendant for alleged activities in connection with the infamous MS-13 street gang.  Those activities included conspiracy and firearms charges from events occurring from 2012 through August 14, 2014, on which date the petitioner purportedly fired a gun at a group of people, endangering though not physically injuring them.  He was arrested on October 9, 2014, and charged with numerous felony offenses.  On March 23, 2015, Etah entered a notice of appearance for Petitioner.

Jury selection commenced on February 8, 2016.  On March 21, 2016, a jury convicted him on all charges.  On July 11, 2016, Petitioner was sentenced, still represented by Etah.  The sentencing judge did not inquire as to whether Petitioner was satisfied with his counsel.  Rather, he generally asked if Petitioner was "ready for sentence."  During that proceeding, the following colloquy took place:

> THE CLERK [sic]: Mr. Arevalo, do you wish to be heard before you are sentenced?
>
> THE DEFENDANT: Yes. This is unfair. This is unfair. The witnesses say they were looking for me and that I was shooting at the victims. Those people, there is no proof it was me. And I am innocent of all of the charges that I am being accused of.
>
> THE COURT: Is that it?
>
> THE DEFENDANT: That's it, sir.

DE 14 at 6.  The state court sentenced him to a total term of imprisonment of 15 years.

---

Remarkably, this testimony did not draw an objection from petitioner's attorney; indeed, as the DA's Office now acknowledges, "Etah did not object to the majority of the background testimony in question."  DE 36 at 8.  While these could form independent bases for the relief sought, the Court need not reach them for the purposes of this decision.

*Disciplinary and Criminal Charges against Petitioner's Attorney*

Meanwhile, Etah had troubles of his own.  Prior to filing a notice of appearance for Petitioner, Etah was already facing disciplinary charges based upon an October 21, 2014, petition filed by the Grievance Committee against him.  Those charges included using his attorney account to help a client violate a court order, asserting false facts in an appellate filing and making false filings in other court proceedings.  On September 24, 2015, after Etah's notice of appearance for Petitioner, an attorney misconduct hearing was held.  In January 2016, prior to Petitioner's trial, a referee entered a report finding professional misconduct by Etah.  Ultimately, in February 2017, shortly after Etah concluded his representation of Petitioner, the Appellate Division sustained all three charges, suspending Etah from the practice of law for three years.  *In re Etah*, 148 A.D.3d 90, 92, 45 N.Y.S.3d 573, 575 (2017).

Of even greater concern are the criminal charges lodged by the DA's Office against Etah based upon the July 7, 2015, assault described above.  On July 15, 2015, following the attack by Etah upon his former girlfriend, a felony complaint was lodged against him by the DA's Office.  DE 36-1 at 16.  Etah failed to appear for two surrender dates, and twice hid from the police attempting to arrest him.  *Id.*  On October 2015, based upon a court order, "the felony complaint was converted to a misdemeanor information [ ] charging the respondent with assault in the third degree."  *Matter of Etah*, 175 A.D.3d 81, 83, 103 N.Y.S.3d 607, 609 (2019).  Following a ten-day jury trial, on May 19, 2017, Etah was convicted of the assault charges.  On August 20, 2017, Etah was sentenced to 60 days incarceration.  DE 36-1 at 17.  In July 2019, Etah was disbarred based on this conviction.  *Etah*, 103 N.Y.S.3d at 608.

At no time did Etah advise Petitioner that he was facing charges brought by the same prosecutorial authority that was seeking Petitioner's conviction; in fact, when finally compelled

4

to testify, "Etah stated that during his time representing petitioner, he never said or did anything to indicate that he had any charges pending against him."  DE 36 at 23 (citing Hearing Tr. 65-66).

*Post-Conviction Proceedings*

The history of post-conviction proceedings, including direct appeals and other state procedural devices by which Petitioner sought to set aside the conviction or obtain other relief is lengthy.  Notably, though, throughout the state proceedings that preceded the instant habeas petition, notwithstanding mandatory obligations to do so, neither the DA's Office nor Etah disclosed the facts surrounding the disciplinary and criminal difficulties to Petitioner or the state courts.  Thus, none of those state court decisions that preceded this petition—and there are many—were reached with the benefit of a full factual record.  Petitioner cannot be faulted for not raising the conflict issues that infect the record here, and the state courts did not have the opportunity to apply the appropriate standards except in the two decisions that followed the filing of this Petition and this Court's appointment of habeas counsel.

*The Direct Appeal*

Following his conviction and sentencing, Petitioner, represented by new appellate counsel, filed a direct appeal.  In October 2017, appellate counsel filed a 48-page brief seeking reversal based on, in part, alleged ineffective assistance of counsel by Etah, including colorable arguments about Etah's repeated failure to object to hearsay testimony by the "detective-experts" and failure to request an accomplice jury charge as to one witness.  DE 12 at 41-49.  Though the

brief was filed after Etah's suspension from the bar in February 2017 based upon the disciplinary charges, the brief makes no mention of this fact.[4]

In response, the DA's Office filed a brief—authored by the same ADA who currently appears for Respondent in this case—arguing that "the totality of the circumstances demonstrates that [Etah] furnished meaningful representation." DE 12-1 at 69. Notably, that brief was filed in January 2018, after the DA's Office had arrested, charged and convicted Etah, who had been sentenced to a period of incarceration. *Id.* at 74. Amazingly, of the 16,991 words in that document that defend Etah's advocacy based upon the "totality of the circumstances," not one word was devoted to advising the state appellate court of the conflict that arose from the actions of the DA's Office. *Id.* at 75. Lacking any insight into the facts surrounding Etah's conflicts, the Second Department rejected the appeal, applying the prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Arevalo*, 168 A.D.3d 1091, 90 N.Y.S.3d 912 (2d Dep't 2019).

*Petitioner's Pro Se Motion to Set Aside Judgment*

In May 2018, Petitioner filed a *pro se* motion for a writ *coram nobis* seeking to set aside his conviction, again predicated on the absence of competent trial counsel, and specifying certain grounds in support of that contention. DE 14-1. In a fourteen-page responsive brief filed in July 2018, the DA's Office characterized the ineffective assistance claim as "meritless," relying on the *Strickland* standard and the "totality of the circumstances" to successfully seek the denial of the motion. DE 14-2 at 11. However, the "totality of the circumstances," as presented by the DA's Office, did not include the investigation, arrest, prosecution, conviction or sentencing of

---

[4] That Etah's suspension and criminal charges could have been discovered in the space of a few minutes might implicate whether Petitioner received effective assistance of appellate counsel, a question that is not before the Court.

6

Etah.  Applying the *Strickland* standard, as requested, the state court denied the motion.  DE 14-8 at 5-6.

*Petitioner's Second Coram Nobis Application*

Petitioner—still ignorant of his trial counsel's legal and disciplinary issues—filed a second *pro se coram nobis* motion, seeking to set aside the sentence based upon ineffective assistance of both trial and appellate counsel, reframing the hearsay issues, while also noting that trial counsel did not seek a mistrial based on the wholesale dismissal and replacement of eight sworn jurors.  *See* DE 12-3.  In July 2019, the DA's office—again via the same ADA appearing before this Court—affirmed that Etah "provided meaningful representation."  DE 12-5 at 7. Despite filing a seventeen-page brief, the DA's Office again failed to make any mention that it had investigated, successfully prosecuted and sentenced Etah.  The Appellate Division, lacking any information about these events, denied the motion, relying on the *Strickland* standard.  DE 12-6 (citing *People v. Stultz*, 2 N.Y.3d 277, 283, 810 N.E.2d 883, 887 (2004) ("To prevail, the defendant must prove that trial counsel did not render reasonably competent assistance and that there is a reasonable probability that, but for the counsel's inadequacy, the outcome of the trial would have been different.")).

*Petitioner's Habeas Petition*

Which bring us to the instant case.  In December 2019, Petitioner filed a *pro se* petition for a writ of habeas corpus with this Court pursuant to 28 U.S.C. § 2254.  In it, he reiterated his ineffective assistance claims, noting that "the State Courts failed to provide a reasoned method of inquiry into relevant questions of fact and law by not furnishing the Petitioner with a fair chance to litigate the ineffective assistance of trial counsel."  DE 3 at 5.  Following issuance of an Order to Show Cause by Judge Seybert, the DA's Office, via an ADA who noted that she had

"previously handled petitioner's criminal case," sought an extension of time to file its response, further representing:

> Petitioner has filed a sixty-eight-page memorandum of law in support of his habeas petition, raising multiple arguments. Each of petitioner's claims require comprehensive analysis, investigation, and research. Moreover, the record of petitioner's trial is voluminous, and the charges are very serious.

DE 7.  Judge Seybert granted the DA's Office a three-month adjournment.

In January 2020, the case was reassigned to the undersigned.  In March 2020, the DA's Office filed an Affidavit and Memorandum asserting, *inter alia*, that the claims of ineffective assistance were "wholly without merit."  DE 9 at 3.  Conspicuously absent from the filings by the DA's Office was so much as a whisper that Etah had been suspended, prosecuted, convicted and (by that time) consequently disbarred from the practice of law based on actions taken by the DA's Office.  DE 9 through DE 14.  After reviewing the filings, the Court entered an order appointing counsel for Petitioner, noting:

> Following the Court's review of the pending pro se habeas petition, it appears that this petition presents potentially serious and complex legal issues, including but not limited to the fair trial/double jeopardy implications of the wholesale replacement of eight sworn jurors and the hearsay identification testimony directly implicating the defendant in the guise of expert witness testimony. As such, upon its own motion, the Court hereby exercises its discretion under 18 U.S.C. § 3006A(a)(2)(B) to appoint Richard Ware Levitt as CJA counsel for the petitioner. In order to facilitate this matter, the petition is deemed withdrawn without prejudice to refiling *nunc pro tunc* by appointed counsel.

Electronic Order dated February 11, 2021.

*Appointed Counsel Discovers the Conflict*

According to appointed habeas counsel:

> while reviewing Mr. Arevalo's trial transcript, both undersigned counsel were so struck by trial counsel's incompetence that we questioned whether trial counsel in fact was a licensed attorney. Further investigation revealed that during the time period Mr. Arevalo's trial counsel – Lawrence Etah – represented him, he was being prosecuted by the Nassau County District Attorney's Office for assaulting

8

> his girlfriend, and also was the subject of disciplinary proceedings for
> professional misconduct. After Mr. Arevalo was convicted, Mr. Etah was himself
> convicted at trial of misdemeanor assault and sentenced to 60 days' incarceration
> and the disciplinary proceedings ended, first with his suspension, and then
> disbarment.

DE 33 at 7.  Counsel then moved to stay the instant petition to allow the filing of a motion in

state court in order to permit Petitioner to fully exhaust his state court remedies regarding rights

that might have accrued from counsel's conflict and the repeated failure of the DA's Office to

advise the state courts or the defendant of this conflict.  DE 21.  The Court promptly granted the

application to permit counsel to exhaust state remedies, a process that consumed more than three

years.

*The Post-Habeas State Proceedings*

Petitioner filed a new motion to vacate the judgment under N.Y.C.P.L. § 440.10 based

upon ineffective assistance, including, for the first time, the failure by Etah and the DA's Office

to disclose the conflict arising from Etah's contemporaneous prosecution.  The state court

ordered a limited hearing, which the state court judge described as follows:

> The scope of the hearing was narrow. It was simply to determine whether a
> potential conflict of interest operated on the defense, thereby denying defendant
> the effective assistance of counsel. To a lesser extent, it was to determine if the
> People's failure to advise the court of the potential conflict entitled defendant to a
> new trial.

DE 36-10 at 4.  Obtaining Etah's participation proved as difficult as his initial apprehension on

criminal charges.  As the state judge observed:

> On May 24, 2022, Etah fled from police officers when they attempted to arrest
> him on a warrant issued by this court. The next day, Etah appeared in court,
> waived his right to a material witness hearing, and agreed to return to court and
> testify in this hearing on June 23, 2022. On June 23, Etah appeared and testified,
> albeit grudgingly.

*Id.*

The quality of his testimony remained consistent with this dubious start: Etah proved to be, in the words of the state judge presiding over the hearing, "an uncooperative witness: hostile, angry, bitter and generally not credible." *Id.* at 5. Etah could not recall his own age, the years he graduated college and law school, the years he worked as an attorney before being disbarred or the extent of his criminal experience. DE 36-6 at 12-15. He testified that he recalled representing someone named Jesus Arevalo but could not recognize Petitioner. *Id*. at 15. He had no recollection about the allegations, facts or most of the proceedings in Petitioner's case. *Id.* at 39-40. He could not recall steps he took to prepare Petitioner for sentencing. *Id.* at 53, 58.

Tellingly, Etah could not recall whether disciplinary or criminal charges were pending against him at the time he represented Petitioner, or the nature of the disciplinary charges he faced. *Id.* at 20-21, *cf.* 36 (stating that "I think that [the criminal charges against me] happened way after [Petitioner's] case"). Unable to recall the contemporaneity of these events, Etah could not provide testimony about any effect upon his representation.

Etah's testimony regarding the assault charges brought by the DA's Office against him proved more probative. He continued to maintain, as he had during the pendency of the charges against him, that the victim had "launched an attack on me." *Id.* at 27. He testified that "the detectives were a bunch of liars" that "made up things." *Id.* at 31-32. He believed that the charges brought by the DA's Office were "false charges" noting "if they never lie, they would never get a conviction." *Id.* at 32. When asked if he had been treated fairly by the prosecution, Etah stated, "Nobody ever treats a black man in America fairly." *Id.* at 34. He testified that in 2015 and 2016, he maintained a belief that the reasons he had been charged in the criminal case were "all nonsense." *Id.* at 35. The state court found that Etah's testimony was generally

unworthy of belief. *People v. Arevalo*, 205 N.Y.S.3d at 209 (noting that "the court found that trial counsel was an uncooperative witness who was generally not credible.").

In addition to Etah's testimony, the parties admitted the trial and sentencing transcripts into evidence. Further, as part of his submissions, Petitioner submitted a sworn affidavit stating the following:

> I was not aware that my counsel, Lawrence Etah, was criminally charged, or subject of a disciplinary action, while representing me. He never disclosed this to me. The first time I learned of the criminal charges and disciplinary actions levied against Lawrence Etah was through Mr. Levitt on our June 16, 2021 call.
>
> Had I known that, while representing me, Lawrence Etah was criminally charged with assault in the same court I was being prosecuted in, and facing disciplinary charges for lying and submitting fraudulent documents to a court, I would have sought out new counsel.

DE 28-2 at 260. At the hearing, the DA's Office did not call the Petitioner to the stand to challenge these assertions, though afforded the opportunity to do so. DE 36-6 at 82. Thus, this evidence that was properly before the state court remains unrebutted.

Finally, the parties entered a stipulation that (1) "the Nassau County District Attorney's office is chargeable with the knowledge that Lawrence Etah was representing defendant Jesus Arevalo at the same time he was being prosecuted on an unrelated matter by the same office" and (2) "ADA Lauren Kalaydjian does not recall precisely whether they learned that Lawrence Etah was prosecuted by the Nassau County District Attorney's office while simultaneously representing defendant, but she knows she learned of it after defendant's trial and possibly before his sentencing." *Id.* at 81.

Evaluating these offerings, the state judge surprisingly noted that "the court's decision is not a difficult one," concluding that:

> Whatever else might be said of Mr. Etah today, six years after he last represented defendant, and whatever criticisms may be leveled against his performance at

11

> trial, not a shred of evidence was presented pinning those alleged deficiencies on his then pending criminal and disciplinary charges. Accordingly, [ ] the potential conflicts never operated on or affected defendant's case and there was no evidence of serious or intentional misconduct by the People.

DE 36-10 at 4. In affirming this conclusion, the Second Department, without further

explanation, held as follows:

> Even if trial counsel's hearing testimony that the criminal and disciplinary proceedings did not affect his representation of the defendant was not credited, the defendant nevertheless failed to make a connection between the potential conflicts and the alleged representational deficiencies.

> Further, although the prosecution had a mandatory, affirmative obligation to recognize the existence of a potential conflict and to alert the Supreme Court to the facts and circumstances surrounding that potential conflict, the defendant did not establish that the prosecutor's failure to do so here required vacatur of the judgment of conviction.

*People v. Arevalo*, 205 N.Y.S.3d 207, 210–11 (citation omitted), *leave to appeal denied*, 42

N.Y.3d 925, 240 N.E.3d 828 (2024).

*Renewed Proceedings Before this Court*

Following the conclusion of the 440 proceedings, the parties again briefed the instant

habeas petition. For the first time before this Court, the DA's Office begrudgingly

acknowledged that it had institutional knowledge of both prosecutions and failed to notify the

state court or the Petitioner. DE 36 at 65 (mentioning "the prosecutor's failure to notify the trial

court of Etah's potential conflict"). Given the troubling history of this case, one might expect

some degree of contrition in those filings. Instead, the DA's Office continues to attempt to

distance itself from its egregious lapses in this matter, and in its zealousness, has again made

careless and potentially misleading arguments before this Court and the state courts.[5]

---

[5] Another example of the apathy with which the DA's Office has approached this matter despite repeated failures before this Court and the state courts is found in its argument. Prior to filing its most recent memorandum, the District Attorney requested, and the Court granted, an extension

The DA's Office represented in the state proceedings that, "as attested to by A.D.A.

Kalaydjian (who prosecuted petitioner's case), *she was unaware during the pendency of*

*petitioner's prosecution* that Etah had disciplinary and Nassau criminal charges pending against

him and there was no evidence of bad faith." *Id.* at 19 (emphasis added).  Even assuming that

the individual ADA's knowledge is relevant, this representation is untrue.

The ADA's affirmation states that she learned of the pending criminal charges against

Etah during or immediately following Petitioner's trial.  DE 36-2 at 3 (discussing how a

colleague who reviewed the "court activity sheet" reporting the trial told Kalaydjian about the

criminal charges against Etah); *cf.* DE 36 at 17-18 ("A.D.A. Kalaydjian stated unequivocally that

she did not know *until after petitioner's trial* that Etah had been prosecuted by the Nassau

County District Attorney's Office during the pendency of petitioner's criminal case") (emphasis

added); DE 36-10 at 7 (court finding that "the trial prosecutor did not learn of the criminal

charges against Etah until after defendant's trial").  In other words, to the extent it is relevant

(and it may not be given the institutional awareness of Etah's prosecution), Kalaydjian learned of

the conflict well before petitioner's sentencing, and yet still failed to advise the court.  Of course,

post-trial, pre-sentencing discovery of a potential conflict required inquiry by a court and thus a

concomitant obligation to inform the court.  *See, e.g.*, *United States v. Salvagno*, 344 F. App'x

660, 662 (2d Cir. 2009) (holding, in connection with sentencing that "[w]henever a district court

discovers that a defendant's attorney suffers from a conflict or potential conflict, 'such that a

---

of time to permit "comprehensive analysis and research" of the issues in this case.  DE 34.  A
large portion of the resulting memorandum argues that, to prevail here, Petitioner need establish
that "but for counsel's unprofessional errors, the result of the proceeding would have been
different."  DE 36 at 36; *cf. id*. at 56-59.  This standard, as discussed, is plainly inapplicable to
the instant proceeding and its application would constitute reversible error.  *Armienti v. United
States*, 234 F.3d 820, 824 (2d Cir. 2000) (holding that district court "wrongly" applied
*Strickland*'s prejudice standard).

13

rational defendant could knowingly and intelligently desire the conflicted lawyer's representation[,] the court should follow the procedures set out in [*United States v. Curcio*, 680 F.2d 881, 888–90 (2d Cir.1982)] in order to obtain directly from the defendant a valid waiver of his right to a non-conflicted lawyer'").

Second, the DA's Office argues that "[a]s stated in the affirmation of A.D.A. Kalaydjian, neither she, *nor the other prosecutors assigned to petitioner's criminal case*, were aware during the pendency of the prosecution that Etah was concurrently being prosecuted" by the DA's Office. DE 36 at 65 (emphasis added) (citing, generally, Kalaydjian Affirmation). Examination of the Kalaydjian affirmation reveals that she did not specifically investigate whether the other ADA's handling the case were, in fact, aware of the criminal charges. DE 36-2 at 5 (affirming that Kalaydjian spoke only with A.D.A. Rabinowitz in preparing the affirmation). The suggestion that the other line prosecutors were similarly unaware of the charges is the product of "surmise" on the part of Kalaydjian. *Id.* at 3.

Third, in a sworn affirmation submitted to the state court and this Court, Kalaydjian asserts the following:

> Even now, in retrospect, I cannot recall anything Mr. Etah did that could somehow be construed as having been an attempt to curry favor with the Nassau County District Attorney's Office relating to his own criminal case. *Nor did it ever strike me that Mr. Etah had an axe to grind against the Nassau County District Attorney's Office or the Court.* He appeared to provide competent representation to the defendant.

DE 36-2 at 4 (emphasis added); *cf.* DE 36 at 38 (arguments derived therefrom). Yet Kalaydjian's upbeat assessment of Etah's performance, buttressed by her recollection of an absence of resentment on the part of Mr. Etah, is undermined by the trial transcript. Only minutes into the trial, A.D.A. Kalaydjian's first substantive application to the Court consisted of the following:

> Judge, the People at this time are making a motion *in limine* for the defense. We
> talked about this briefly in chambers. I'm asking he be precluded from making
> any mention of the district attorneys committing any kind of misconduct because
> it would be prejudicial in front of the jury to make insinuations or to outright say
> that I have done something wrong or be acting in bad faith and counsel has been
> making those assertions throughout the beginning of this case ever since the case
> was indicted to me, personally, on the phone, back in chambers. Pretty much
> every time I have seen him, he's made those type of allegations. I'm asking he be
> precluded from doing so in front of the jury.

DE 10-1 at 10. That the Court granted this motion did not prevent Etah from hurling accusations

at the DA's Office during his opening statement. DE 10-2 at 25 ("when did the district attorney

become aware of this information and what did they do?" and "Did the district attorney decide to

look into whether Jesus Arevalo was the victim of a crime?"). The trial judge sustained

Kalaydjian's objections to both assertions, *id.*, yet Etah's intimations about the D.A.'s Office

further undermine Kalaydjian's assessment of her interactions with Etah.

Another trial incident further undermines the assertion that Etah evidenced no ill will

toward the prosecution. Days into the trial, Kalaydjian's co-counsel disclosed that while

preparing a witness for trial testimony, she had mistakenly left two photographs of the Petitioner

out on her desk, prompting the witness to point to one photo and advise "There's the shooter."

DE 10-3 at 76. Etah responded fiercely, characterizing the prosecutor's actions as "unfair to the

defendant" and an attempt to "perpetrate a fraud on the Court." *Id.* at 78-79. Counsel's

vehemence led the Court to instruct him to "stop yelling." *Id.* The Court then inquired of Etah,

"Let me understand this, you are now accusing the district attorneys of misconduct in the trial?"

to which Etah responded "Absolutely." *Id.*

In addition, on this application, the DA's Office argues that the prosecution of Etah was

handled by "a separate bureau located in a different building/town" from that which prosecuted

Petitioner. DE 36 at 7. This point is irrelevant, if not misleading. Following the conviction of

both the Petitioner and Etah, the DA's Office issued press releases trumpeting each event to the media.  First, on March 23, 2016, the DA's Office issued a statement—still available on its website—that "Nassau County District Attorney Madeline Singas announced that a jury has convicted an MS-13 gang leader for assaults and intimidation—including a shooting—against teenage and younger Salvadorean immigrants in Uniondale."[7]  Following a lengthy description of the case, the statement concludes by noting that "Arevalo is represented by Lawrence Etah, Esq."  *Id.*  On August 21, 2017, the DA's Office posted an announcement stating:

> Nassau County District Attorney Madeline Singas announced that a Hempstead-based attorney was sentenced today to 60 days in jail for a July 2015 assault. Lawrence Etah, 54, from Central Islip, was found guilty of Assault in the 3rd Degree by a jury on May 19 before District Court Judge Susan Kluewer. [ ]

> "This now-suspended lawyer sent his victim to the hospital when he brutally attacked her following a minor disagreement," DA Singas said. "Lawrence Etah deserves the jail sentence he received for this disgusting display of violence and I am grateful to the Nassau and Hempstead police and our prosecutors for their outstanding work." [ ]

> The defendant was arrested on July 15, 2015, after a joint investigation of the Nassau County and Hempstead police departments.

> The defendant's ability to practice law was suspended on February 1, 2017, for three years for an unrelated matter.[8]

Both press releases carry the byline "MINEOLA, N.Y.," belying the geographic distinction now posited by the DA's Office.  That the trial ADAs were assigned to "separate bureaus" in a "different building/town" seems to have mattered little: when convictions were obtained, it was the same District Attorney that heralded the trial victories from her Office.

---

[7] https://perma.cc/9T5G-JZWU
[8] https://perma.cc/L836-87Y8

## DISCUSSION

As the Second Circuit has explained:

> The right to counsel under the Sixth Amendment entails "a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)). As we have explained in recent opinions, a defendant has suffered ineffective assistance of counsel in violation of the Sixth Amendment if his attorney has (1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance. *See Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir.1993) (citing *Strickland v. Washington*, 466 U.S 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)), cert. denied, ――― U.S. ―――, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994); *United States v. Fulton*, 5 F.3d 605, 609 (2d Cir.1993).

*United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994).  As the state court has recognized, these precepts plainly apply to the instant case.  *People v. Arevalo*, 224 A.D.3d 768, 769, 205 N.Y.S.3d 207, 209, *leave to appeal denied*, 42 N.Y.3d 925, 240 N.E.3d 828 (2024) ("Both the Federal and New York State Constitutions guarantee a criminal defendant legal representation that is reasonably competent, conflict-free and singlemindedly devoted to the client's best interests." (internal quotations omitted)).

Special considerations arise where, as here, an attorney is subject to investigation and/or prosecution by the same prosecuting authority that is proceeding against his client.  These circumstances give rise to "a plausible claim that [the] lawyer had an actual conflict of interest," because the "interests of lawyer and client may therefore have diverged with respect to their dealings with that office."  *Armienti*, 234 F.3d at 824–25.

That conflict can manifest in three principal ways.  First, "[a] lawyer in these circumstances, while dealing on behalf of his client with the office that is prosecuting him personally may, consciously or otherwise, seek the goodwill of the office for his own benefit." *Id.*; *see Levy*, 25 F.3d at 156 ("Fisher may have believed he had an interest in tempering his

17

defense of Levy in order to curry favor with the prosecution, perhaps fearing that a spirited defense of Levy would prompt the Government to pursue the case against Fisher with greater vigor.").  Next, the other end of the spectrum holds a risk far more relevant here: that a lawyer facing charges from the same prosecution office "would be unduly hostile toward [the prosecution], losing objectivity, and thus harm [the lawyer's] rapport with the jury." *United States v. Lowry*, 971 F.2d 55, 61 (7th Cir. 1992).  Finally, in between those extremes, a "lawyer's own criminal investigation [might] cause him to devote less time to his representation of [his client] and to be ill-prepared and distracted at trial."  *Armienti* 234 F.3d at 824–25; *cf. Herrera v. Russi*, No. 95-CV-187 (CPS), 1996 WL 651017, at *9 (E.D.N.Y. Nov. 6, 1996) (observing that even where a lawyer is facing solely non-criminal disciplinary charges "a conflict could arise simply because it is plausible [the lawyer] was unable to zealously represent the petitioner because of [the lawyer's] preoccupation with the investigation into his competence and his possible suspension or disbarment").

When properly advised of such a conflict, a trial court is required to "alert the defendants to the substance of the dangers of representation by an attorney having divided loyalties." *United States v. Curcio*, 680 F.2d 881, 888 (2d Cir. 1982); *People v. Arevalo*, 205 N.Y.S.3d at 210 ("reversal is required if the defendant does not waive the actual conflict") (quoting *People v. Sanchez*, 21 N.Y.3d at 223, 969 N.Y.S.2d 840 (2013)).  Should the defendant opt to waive the conflict,

> waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

*Curcio*, 680 F.2d at 888 (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)).  This is a

nuanced exercise, requiring, among other things, an "inquiry [that] should take place after the

defendants have had a reasonable time to digest and contemplate the risks posed" by the conflict.

*Id.* at 889.

       In this case, though, the state court never made such an inquiry due to the wanton failure

by Etah and the DA's Office to disclose the dual prosecutions to the court.  As the Second

Department noted, "the prosecution had a mandatory, affirmative obligation to recognize the

existence of a potential conflict and to alert the Supreme Court to the facts and circumstances

surrounding that potential conflict."  *People v. Arevalo*, 205 N.Y.S.3d at 211.  The state judge

found that Etah, though under a similar mandatory duty of disclosure, "did not disclose his

pending disciplinary proceedings or criminal charges to defendant or to the trial court."  DE 36-

10 at 7.

       *Effect on the Representation*

       Having raised a plausible claim that his lawyer labored under an actual conflict,

Petitioner is required to demonstrate that "the conflict adversely affected his lawyer's

performance."  *Armienti*, 234 F.3d at 825 (citing *Briguglio v. United States*, 675 F.2d 81,

82 (3d Cir. 1982) (holding that where trial counsel was under investigation by same

United States Attorney's office that was prosecuting counsel's client, evidentiary hearing

was required to determine if "counsel labored under an actual conflict of interest, whether

any such conflict may have affected the adequacy of his representation, or whether [the

client] was prejudiced by his counsel's difficulties")).  Petitioner does not have to

demonstrate "that counsel's conduct fell below an objective standard of reasonableness

and that but for this deficient conduct, the result of the trial would have been different,

under the familiar standard established by *Strickland*."  *Armienti*, 234 F.3d at 824

(holding that district court "wrongly" applied *Strickland*'s prejudice standard").  The

Supreme Court has held that "a defendant who shows that a conflict of interest actually

affected the adequacy of his representation need not demonstrate prejudice in order to

obtain relief."  *Cuyler*, 446 U.S. at 349–50.  The Petitioner must therefore demonstrate

that the attorney's conflicts "adversely affected" his performance.  *Levy*, 25 F. 3d at 157.

The Second Circuit has explained that:

> The test requires a defendant to demonstrate that some "plausible alternative
> defense strategy or tactic might have been pursued," and that the "alternative
> defense was inherently in conflict with or not undertaken due to the attorney's
> other loyalties or interests."

*Id.*  In a factually similar case involving an attorney who had entered a plea agreement with the

prosecution concerning his own criminal activity, the Seventh Circuit described this test as

follows:

> An actual conflict of interest results if the defense attorney was required to make a
> choice advancing his own interests to the detriment of his client's interests. An
> "adverse effect" occurs when an attorney's actual conflict of interest causes a
> lapse in representation contrary to the defendant's interests.  [ ]
> An adverse effect occurs, if, but for the attorney's actual conflict of interest, there
> is a [reasonable] likelihood that counsel's performance somehow would have been
> different.

*Stoia v. United States*, 22 F.3d 766, 771 (7th Cir. 1994) (alterations and citations omitted).

Here, the record reveals several ways in which the Etah's conflicts—long concealed but

now made patent—directly affected and operated upon his representation.  The first, and most

fundamental, is his failure to disclose the conflicts arising from his pending criminal problems to

Petitioner.  As the Supreme Court held:

> Counsel's function is to assist the defendant, and hence counsel owes the client a
> duty of loyalty, a duty to avoid conflicts of interest. *See Cuyler v. Sullivan, supra*,
> 446 U.S., at 346, 90 S.Ct., at 1717. From counsel's function as assistant to the

20

> defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.

*Strickland*, 466 U.S. at 688. Etah's failure to disclose the potential conflicts represents a failure to all carry out three of the duties described above, including the duties to avoid conflicts of interest, to consult with the defendant on important decisions and to keep the defendant apprised of important developments. While he refused to acknowledge it at the hearing, such failure was unquestionably motivated by the consequences that revelation might carry, including the impact on his pending disciplinary problems. *See Herrera*, 1996 WL 651017, at *9 ("By disclosing the pending disciplinary charges to the petitioner, [the lawyer] ran the risk that petitioner might replace [him] with other counsel. Petitioner's rejection of [the lawyer] as trial counsel could deprive [him] of an opportunity to demonstrate his competence to the Disciplinary Committee and could also be seen as further evidence of [his] inability to practice law."). Furthermore, in this case, Etah had been retained by Petitioner's mother, and termination of the representation almost certainly carried the threat of an adverse financial impact.

Closely related to the failure to disclose the conflict to Petitioner is Etah's neglect of his mandatory obligation to disclose his circumstances to the state court. Emanating from that failure is the absence of a waiver inquiry hearing. Thus, the conflict substantively affected Etah's representation of Petitioner, as his concealment of the conflict deprived Petitioner of his constitutional right to—at a minimum—an inquiry and waiver of the conflict. This also demonstrates a related failure to properly advise his client as to his right to a conflict hearing. As described above, such an inquiry represents a substantive undertaking. *Martinez v. Kirkpatrick*, 486 F. App'x 158, 161 (2d Cir. 2012) ("[T]here was no state court record on the existence of an

actual conflict, since (as the parties acknowledge on appeal) the conflict of interest claim was never adjudicated on the merits in state court.").

In disregarding these lapses, the state court relied exclusively on *People v. Harris*, 99 N.Y.2d 202, 211 (2002).  The application of the Sixth Amendment in *Harris* is inapposite, as in that case the defense lawyer was unaware of the conflict, it could not have affected the representation.  *Id.* at 210 ("Albanese was unaware that the confidential informant was cooperating against Harris and although he advised the informant to continue cooperating with the District Attorney's office—clearly contrary to the interests of defendant Harris—the representation was not affected by the potential conflict.").  This case bears a greater similarity to *People v. Wandell*, 75 N.Y.2d 951, 953, 554 N.E.2d 1274, 1275 (1990), which held:

> Here, both defense counsel and the prosecution were acutely aware that a conflict existed by virtue of defense counsel's representation of the prosecution's chief witness (*see, e.g., People v. Lombardo, supra*). Their failure to bring the underlying facts to the court's attention is inexcusable. Having previously been personally responsible for a reversal because of a similar omission, both the District Attorney and defense counsel were undoubtedly aware of their duty to alert the court to the need for a *Gomberg* inquiry (*see, People v. Mattison, 67 N.Y.2d 462, 503 N.Y.S.2d 709, 494 N.E.2d 1374, supra*). Under these circumstances, a reversal and new trial are required.

The Court finds that the decision of the state court here that the conflict did not affect the representation constitutes an unreasonable application of federal law.

The complicity of the attorneys—and in particular defense counsel—in concealing a conflict from a defendant has often been critical in determining whether a lingering conflict affected the representation:

> it cannot be said that Guran was prevented from mounting a robust defense because he had something to hide. The petition to suspend Guran pending in the First Department at the time of Bellamy's trial was based on Guran's alleged ill health, not on any promise to secure co-counsel. As discussed above, Guran informed the court of his situation. Compared to counsel in *Novak, Solina,* and *Cancilla*, Guran had no skeletons in his closet giving rise to a conflict of interest

that would have inhibited him from defending Bellamy vigorously. Indeed, the record indisputably reflects that Guran provided vigorous, competent advocacy on Bellamy's behalf.

*Bellamy v. Cogdell*, 974 F.2d 302, 308 (2d Cir. 1992). Just as Justice Brandeis has noted

"sunlight is said to be the best of disinfectants,"[9] courts have consistently viewed disclosure as

an effective remedy in these circumstances, while the failure to disclose raises doubts. *United*

*States v. Rondon*, 204 F.3d 376, 381 (2d Cir. 2000) ("[A]ny potential problem was cured by

Rojas's prompt action in bringing his disbarment to the attention of his client and the District

Court.").

Here, by contrast, Etah's closet contained more than one skeleton, as he was facing the

undisclosed criminal charges and extremely serious pending disciplinary matters.[10] Yet neither

he nor the DA's Office chose to raise these matters during the prosecution, including through

trial and sentencing, and the DA's Office inexplicably remained mute throughout several

appellate processes and even before this Court.[11] These facts alone demonstrate an adverse

effect upon the representation.

Additionally, these factors—the failure to disclose Etah's multiple conflicts and properly

advise petitioner concerning his right to a conflict waiver hearing—highlight evidence

---

[9] "Justice Louis Brandeis penned his most famous statement in a 1913 *Harper's Weekly* article titled 'What Publicity Can Do.'" *Miller v. Anderson*, No. 20-CV-1743 (JRA), 2024 WL 2252495, at *4 (N.D. Ohio 2024).

[10] It appears that Etah was not required to disclose the pending disciplinary sanctions—which encompassed serious conduct—during their pendency. However, when considering the effects on Etah during his representation of Petitioner, and combined with the undisclosed criminal violations and prosecution, the disciplinary proceedings add a helping of carrion to an already vile stew.

[11] Petitioner's counsel urges the Court to grant relief solely based upon the outrageous lapses by the DA's Office. The Court declines to impose a *per se* rule in this regard. However, as noted in the remedy section below, the DA's lapses, which were truly egregious in their scope and duration, are not without consequence.

23

overlooked by the state courts in denying Petitioner's 440 motion.  Petitioner submitted
uncontested evidence that, properly advised, he would have discharged Etah and hired new
counsel.  This unchallenged evidence demonstrates that representational deficiencies are more
than hypothetical.  While Petitioner does not have to demonstrate the outcome-altering prejudice
required under Strickland, he has established a tangible adverse effect emanating from the
conflict.

Furthermore, while Etah's lack of recollection severely limits the probity of the hearing
record, there is specific record evidence strongly suggesting that Etah suffered from the conflict
risk defined in *United States v. Lowry*: an attorney who "would be unduly hostile toward [the
prosecution], losing objectivity, and thus harm [the lawyer's] rapport with the jury."  971 F.2d at
61.  This conflict manifested at several points leading up to and during the trial: (1) Kalaydjian's
successful motion *in limine* barring Etah from accusing the DA's Office of misconduct or bad
faith, conduct in which, she represented, he had been engaging "ever since the case was indicted
[ ] [p]retty much every time I've seen him," DE 10-1 at 10; (2) Etah's opening statement, made
only minutes after the Court entered the *in limine* order, during which he twice accused the DA's
Office of bad faith, drawing objections from the prosecution, DE 10-2 at 25; and (3) Etah's
screaming allegations of unfairness, fraud and misconduct by the DA's Office several days later.
DE 10-3 at 78-79.  Taken together, these incidents provide objective, contemporaneous evidence
that the prosecutorial conflict served to operate on the representation.[12]

---

[12] Counsel for Petitioner has identified many other instances of abysmal representational deficits
by Etah, many of which were rejected by the state courts during motion and appellate
procedures.  The Court does not reach these issues as, given the plethora of evidence establishing
effects of the conflicts upon Etah's representation, these matters need not be considered.

*The Appropriate Remedy*

Based on the foregoing, it is beyond question that Petitioner has demonstrated that there was a conflict arising from the criminal charges pending against his counsel brought by the same prosecuting authority (which led to the attorney's conviction, incarceration and eventual disbarment, further complicated by pending disciplinary matters so serious that the attorney was suspended from practice by three years).  What, then, is the appropriate remedy?

In certain instances, an appropriate remedy consists of a remand for a hearing as to the nature and extent of the conflict and its effects upon the representation.  *See, e.g.*, *Armienti*, 234 F.3d at 824–25 ("Armienti made a sufficient showing to require the district court to hold an evidentiary hearing to determine whether there was an actual conflict of interest and, if so, whether the conflict adversely affected his lawyer's performance.").  In this case, however, such a remedy is inappropriate for several reasons.  First, in connection with the 440 motion, the state court has already engaged in a hearing of this nature which, though overly limited in its scope, provides crucial information as to the potential efficacy of further proceedings.  Second, this matter has continued for far too long, as Petitioner appears to have served more than ten years of the fifteen-year sentence imposed by the state court.  Third, further hearings would likely prove futile, as Etah has already testified to an absence of recollection—and an intransigent inability to have that recollection refreshed—as to the impact that the conflicts may have had on his representation.  *See* DE 36-10 at 5-6 (finding that Etah "implausibly claimed that his recollection of [the criminal allegations against him] was not refreshed").

Importantly, these reasons all have a common cause: each emanates, in whole or part, from the egregious disclosure lapses by the DA's Office that have permeated these proceedings.

only when this Court appointed counsel in this case were the facts uncovered, while the DA's Office remained silent throughout and, when confronted, attempted to dissemble and distract from its blatant failings. These inexcusable failures by the DA's Office contributed to the lengthy delays, which rendered evidence unavailable through the failure of recollection. A hearing would prove futile and only serve to contribute to further delay. As such, the only remaining remedy is that requested by Petitioner, to wit: a retrial in short order. *People v. Wandell*, 75 N.Y.2d at 953 ("Under these circumstances, a reversal and new trial are required.").

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is granted. His conviction and sentence are hereby vacated, and the matter is returned to the state court for retrial. Should the retrial not be commenced within 120 days of the date of this order, Petitioner is granted leave to apply for further relief.

**SO ORDERED.**

Dated:  Central Islip, New York
        November 6, 2024

                            /s/Gary R. Brown
                            GARY R. BROWN
                            United States District Judge